SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v. .

Robert H. WILLIS, et al., Defendants.

No. 91 Civ. 0322 (MP).

United States District Court, S.D. New York.

June 30, 1993.

S.E.C. by Robert B. Blackburn, Daniel Schnipper, Dorothy Heyl and Gregory Johnson, New York City, for S.E.C.

Hoffinger, Friedland, Dobrish, Bernfeld & Stern by Jack S. Hoffinger and David B.

Bernfeld, Shereff, Friedman, Hoffman & Goodman by Andrew J. Levander and David S. Hoffner, New York City, for defendant Martin B. Sloate.

## DECISION AND FINAL JUDGMENT OF PERMANENT INJUNCTION AND OTHER RELIEF AS TO DEFENDANT MARTIN B. SLOATE

MILTON POLLACK, Senior District Judge.

The Court hereby enters the following decision and final judgment, making findings of fact and conclusions of law, following a partial trial of this matter, and entering certain relief agreed upon by Plaintiff Securities and Exchange Commission and Defendant Martin B. Sloate (the "Defendant").

### FINDINGS OF FACT

**Background**

1. Sloate has been a registered broker in the securities industry since the early 1960's. Throughout the 1980's, Sloate was president and part-owner of Sloate, Weisman, Murray & Co, Inc. ("Sloate Weisman"). Apart from the allegations in this case, Sloate has never been charged with any wrongdoing in the securities industry.

2. One of Sloate's customers during most of the 1980's was Dr. Robert H. Willis ("Dr. Willis"). Sloate met Willis in college and they had known each other for many years. Willis made some of his investment decisions without regard to Sloate's advice.

3. Willis had a psychiatrist-patient relationship with Joan Weill ("Mrs. Weill") from at least 1980 through 1987.

4. Kenneth Stein ("Stein") was a customer of Sloate's during the 1980's until immediately after the stock market crash on October 19, 1987. Stein, in accounts under his control, regularly traded options. One such account, "8 Brookwood Fund," lost $1.8 million at the time of the stock market crash. After an arbitration, Sloate Weisman was awarded a judgment against 8 Brookwood Fund. Stein and his wife, who live in Westchester County, New York, subsequently declared bankruptcy, and the liability on the judgment relating to 8 Brookwood Fund was discharged.

**Shearson**

5. In 1981, Shearson Loeb Rhoades ("Shearson") was a public company whose common stock traded on the New York Stock Exchange ("NYSE"). The price and volume of Shearson common stock, with highs and lows for the day, as well as the closing bid, for the period January 1, 1981 through July 30, 1981, is set forth in Joint Trial Exhibit 1, Standard & Poor's NYSE Daily Stock Price Record (the third column on the page).

6. From on or about March 20, 1981, through April 20, 1981, Sanford I. Weill ("Weill"), then chief executive officer ("CEO") of Shearson, and James D. Robinson, III ("Robinson"), then CEO of American Express Company ("American Express"), held discussions involving a possible merger of Shearson and American Express. The negotiations concerning the proposed merger between Shearson and American Express were confidential.

7. Weill had a relationship of trust and confidence with Mrs. Weill and had a history of confiding in her about his business affairs. Weill frequently sought, and followed, the advice of Mrs. Weill concerning business matters.

8. In March and April 1981, Weill told Mrs. Weill that he was negotiating the possible merger of Shearson and American Express. Mrs. Weill attended certain meetings involving the proposed merger and Weill sought her advice on whether to proceed with the merger. Weill conveyed information to Mrs. Weill concerning the proposed merger in confidence.

9. In late March and early April 1981, Mrs. Weill, within the context of her psychiatrist-patient relationship with Dr. Willis, frequently conveyed confidences to Dr. Willis concerning the proposed merger.

10. Willis purchased 2,100 shares of Shearson common stock in accounts at Sloate Weisman in his name or under his control, as follows:

| Date Purchased | Number of Shares Purchased |
| --- | --- |
| April 3, 1981 | 400 |
| April 9, 1981 | 500 |
| April 13, 1981 | 500 |
| April 13, 1981 | 500 |
| April 16, 1981 | 200 |

Willis sold or tendered his Shearson shares during the period April 22, 1981 through June 16, 1981. Willis was in possession of material, nonpublic information concerning the Shearson/American Express merger negotiations at the time of his Shearson stock purchases. Willis's purchases of Shearson were in breach of a fiduciary duty owed to Mrs. Weill.

11. In breach of his fiduciary duty to Mrs. Weill, Willis communicated confidential information to Sloate concerning the merger negotiations between Shearson and American Express. Willis further told Sloate that the source of the confidential information was a patient who was a member of the Weill family. The information that Willis conveyed to Sloate concerning the proposed merger was material and nonpublic at the time.

12. Sloate knew or should have known that Willis breached his fiduciary duty he owed a patient, by disclosing the nonpublic information to Sloate that had been confided in him.

13. Sloate purchased 2,200 shares of Shearson common stock in accounts at Sloate Weisman in his name or under his control, as follows:

| Date Purchased | Purchased |
| --- | --- |
| April 9, 1981 | 1000 |
| April 13, 1981 | 300 |
| April 13, 1981 | 300 |
| April 14, 1981 | 200 |
| April 14, 1981 | 100 |
| April 14, 1981 | 300 |

Sloate first purchased Shearson stock on April 9, 1981, which he sold the same day ("day traded"), for a profit of $941.29. Between April 13, 1981, and April 16, 1981, Sloate bought and sold (including another day trade on April 14, 1981) an additional 1,200 shares of Shearson for a profit of $2,817. Thus, in total, Sloate's profits from his own trading in Shearson were at least $3,758.

14. Sloate was in possession of material, nonpublic information concerning the Shearson/American Express merger negotiations at the time of his Shearson stock purchases.

15. On or about April 14, 1981, Sloate told Kenneth Stein ("Stein"), his friend and customer, about his conversation with Willis regarding the possible combination of Shearson and American Express.

16. On April 14 and April 15, 1981, Stein purchased 2,600 shares of Shearson common stock through Sloate. Stein sold the Shearson shares in his accounts on April 21, 1981.

17. April 16, 1981, was the last day Shearson common stock traded prior to the public announcement of the merger on Tuesday, April 21.

18. Articles relating to Shearson appeared on Friday, April 17, 1981, in the *Wall Street Journal* and *New York Times*. The *New York Times* article states that "[t]alks about a possible deal began spreading on Tuesday [April 14, 1981]" and that "Some analysts argued that, although the two companies would be 'a good fit,' the idea of their joining did not seem likely because American Express had had bad luck with an earlier fling in the brokerage business."

19. On Tuesday, April 21, 1981, Shearson announced that it had agreed to a merger with American Express whereby 1.3 shares of American Express common stock would be exchanged for each outstanding share of Shearson common stock, which would have an approximate value of $56.00 per share.

20. Sloate Weisman generated commissions on the transactions of Shearson common stock for Sloate's customers, including Willis and Stein, of approximately $2,446. Sloate received approximately $1,000 in commissions from Sloate Weisman.

### Weill's Proposal To BankAmerica

21. In 1986, BankAmerica Corp. ("BankAmerica") was a public company whose common stock traded on the NYSE. The price and volume of BankAmerica common stock, with highs and lows for the day, as well as the closing bid, for the period October 1, 1985 through June 30, 1986, is set forth in Joint Trial Exhibit 4, Standard & Poor's NYSE Daily Stock Price Record (the fourth column on the page). Weill was never an insider at BankAmerica.

22. During January 1986, it was public information that BankAmerica was experiencing financial difficulties; had reported

huge losses; and omitted a dividend on its common stock. At least two publications contained recommendations to purchase BankAmerica stock, a report by R.B. Albertson et al. of Smith Barney dated October 21, 1985, Joint Trial Exhibit 5, and an article in the American Banker dated January 7, 1986, entitled, "Wall Street Mood on Bank Stocks Mostly Upbeat," Joint Trial Exhibit 6.

23. In early January 1986, Weill developed an interest in obtaining a top position at BankAmerica. Weill decided that his approach to the BankAmerica board would be friendly and non-adversarial. In furtherance of his interest in BankAmerica, Weill held various meetings and consulted with lawyers, investment bankers and BankAmerica directors. Weill's meetings with his advisors and representatives of BankAmerica were confidential.

24. On or about January 29, 1986, Weill received a letter from Shearson captioned "Commitment to Place $1 Billion of Equity Capital for BankAmerica Corporation Under Certain Circumstances" (the "Commitment"). From January 31, 1986, through March 3, 1986, Weill had several communications concerning his proposal with representatives of BankAmerica. Weill was eventually unsuccessful in his effort to get a top position at BankAmerica.

25. Weill told Mrs. Weill, in early January 1986, of his interest in becoming CEO of BankAmerica. In mid-January 1986, Weill further told Mrs. Weill that he was approaching BankAmerica on a friendly basis. Weill generally kept Mrs. Weill current on his progress with the deal, and told her in late January 1986 that he had obtained the Commitment from Shearson.

26. Weill's disclosures to his wife concerning his interest in BankAmerica were confidential.

27. On or before January 14, 1986, and continuing through the first three months of 1986, Mrs. Weill, as a patient, regularly confided to Dr. Willis the progress of Weill's plans concerning BankAmerica.

28. In January 1986, Willis communicated to Sloate that Weill was attempting to take the top position at BankAmerica, that Weill had the support of friends in the financial world, and that the source of the information was a patient who was a member of the Weill family. This communication was in breach of his fiduciary duty to Mrs. Weill. The information that Willis conveyed to Sloate about Weill's BankAmerica plans was material and nonpublic at the time. Sloate responded that this story was ridiculous since BankAmerica was never going to make Weill its CEO. Sloate knew or should have known that Willis breached a fiduciary duty he owed Mrs. Weill by disclosing to Sloate information concerning Weill's plans to take over BankAmerica that Mrs. Weill had confided in Willis.

29. Willis purchased 13,000 shares of BankAmerica common stock in accounts at Sloate Weisman in his name or under his control, as follows:

| Date Purchased | Number of Shares Purchased |
| --- | --- |
| January 14, 1986 | 500 |
| January 14, 1986 | 1000 |
| January 21, 1986 | 600 |
| January 22, 1986 | 500 |
| January 22, 1986 | 500 |
| January 26, 1986 | 600 |
| January 27, 1986 | 2000 |
| January 28, 1986 | 1000 |
| January 28, 1986 | 1500 |
| January 29, 1986 | 1000 |
| January 30, 1986 | 800 |
| January 31, 1986 | 2000 |
| February 6, 1986 | 1000 |

Between January 14 and February 6, 1986, Willis purchased a total of 13,000 shares of BankAmerica at prices as high as $14¾ per share. Willis held his 13,000 share position until February 21, 1986, after the public announcement of Weill's overture to BankAmerica, when he sold these shares.

30. Willis was in possession of material, nonpublic information concerning Weill's proposal to BankAmerica at the time of his BankAmerica stock purchases. Willis's purchases of BankAmerica stock were in breach of a fiduciary duty he owed to Mrs. Weill.

31. Sloate purchased 8,500 shares of BankAmerica common stock in accounts at Sloate Weisman, in his name or under his control, as follows:

| Date Purchased | Number of Shares Purchased |
|---|---|
| January 22, 1986 | 1000 |
| January 28, 1986 | 1500 |
| January 29, 1986 | 1000 |
| February 4, 1986 | 500 |
| February 6, 1986 | 1500 |
| February 7, 1986 | 1000 |
| February 11, 1986 | 2000 |

Sloate first purchased BankAmerica on January 22, 1986, when he bought 1,000 shares at 12¼ per share and he sold those shares two days later for a profit of $524.55. Thereafter, between January 28 and February 11, 1986, Sloate bought a total of 7,500 shares at prices of less than $13 per share. Sloate sold these shares between February 7 and 19, 1986 for a profit of at least $8,435.

32. Sloate was in possession of material, nonpublic information concerning Weill's proposal to BankAmerica at the time of his BankAmerica stock purchases, although Sloate denies that such information influenced his trading in BankAmerica stock.

33. Customers of Sloate purchased BankAmerica common shares and/or options in their accounts at Sloate Weisman as follows:

| Customer | Date Purchased | Number of Shares/ Calls Purchased |
|---|---|---|
| Mae Bach | January 29, 1986 | 1500 |
| | January 31, 1986 | 1000 |
| | February 3, 1986 | 500 |
| | February 4, 1986 | 1000 |
| | February 12, 1986 | 1000 |
| David Barash | January 22, 1986 | 500 |
| | January 28, 1986 | 500 |
| | January 29, 1986 | 2000 |
| | February 7, 1986 | 1000 |
| Peter Cooper | February 6, 1986 | 1500 |
| Stephen Feinberg | January 31, 1986 | 450 |
| Seymour Goldberg | February 6, 1986 | 3000 |
| | February 12, 1986 | 2000 |
| Sonia Goldberg | February 7, 1986 | 2000 |
| Abraham Klausner | January 27, 1986 | 900 |
| | January 31, 1986 | 500 |
| | February 3, 1986 | 500 |
| Elaine Lewis | February 7, 1986 | 200 |
| Frederic Neuwirth | February 6, 1986 | 1000 |
| Steven Schwartz | January 29, 1986 | 70 calls |
| | January 31, 1986 | 25 calls |
| George Strame | January 30, 1986 | 1000 |
| | February 20, 1986 | 30 calls |

Sloate solicited these purchases, directly or indirectly. These customers sold their BankAmerica shares beginning on February 20, 1986, and ending on March 4, 1986, earning total profits of approximately $52,300.

34. Sloate was the broker for each of the foregoing accounts. Sloate Weisman generated commissions on the purchases of BankAmerica securities for Sloate's customers including, Willis, Stein, and Kaye, of ap-

proximately $14,504. Sloate received approximately $6,000 in commissions from Sloate Weisman.

35. In January and February 1986, Sloate told Stein about his conversations with Willis regarding Weill's interest in heading BankAmerica, and that Willis had bought stock in BankAmerica. Sloate told Stein and another customer, Howard Kaye, that he had obtained information regarding BankAmerica from a psychiatrist, who got it from a patient.

36. From January 28, 1986, through February 14, 1986, Stein purchased 4,000 shares of BankAmerica stock and 176 BankAmerica call options in an account under his control at Sloate Weisman.

37. On Thursday, February 20, 1986, Reuters carried a story relating to Weill's interest in BankAmerica. The Reuters story, entitled "BankAmerica Denies Management Rumours," states: "BankAmerica denied stock market rumours of imminent changes in its management, which helped to boost its share price 1⅜ to 15¼ dlrs today in active trading, with over 1.7 mln shares exchanging hands." At the close on February 20, BankAmerica was at $15¼. The next morning, the market opened virtually unchanged, at $15⅜.

## CONCLUSIONS OF LAW

38. This Court therefore concludes that the Defendant violated Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5. The plaintiff satisfied its burden of proving by a preponderance of the evidence that Sloate employed a device, scheme or artifice to defraud, or engaged in an act, manipulative or deceptive transaction, practice or course of business which operated as a fraud or deceit upon the purchaser or any other person, in connection with the purchase or sale of securities, namely the common stock of Shearson and BankAmerica, by using or causing the use of the means or instrumentalities of interstate commerce, the mails or of any facility of a national securities exchange in furtherance of the fraudulent scheme.

39. With respect to both the 1981 trading in Shearson and the 1986 trading in BankAmerica, the Defendant purchased securities while in possession of material, non-public information, which had been obtained in breach of Dr. Willis's fiduciary duty to his patient, and the Defendant knew, or should have known, of Dr. Willis's breach. Furthermore, the Defendant directly or indirectly solicited purchases of Shearson and BankAmerica from customers while he was in possession of material, non-public information, which had been obtained in breach of a fiduciary duty to his patient, and which the Defendant knew, or should have known, was obtained in breach of a fiduciary duty.

## AGREED–UPON RELIEF

40. Upon agreement of the parties, it is hereby ordered, adjudged and decreed that the Defendant and his officers, agents, servants, employees, and attorneys-in-fact, and all persons in active concert or participation with him, who receive actual notice of this decision and final judgment by personal service or otherwise, and each of them, directly or indirectly, be and hereby are permanently enjoined and restrained from, using or employing, in connection with the purchase or sale of any security registered on a national securities exchange, or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may provide, including, but not limited to, Rule 10b–5 [17 C.F.R. § 240.10b–5], in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)].

41. Upon agreement of the parties, it is further ordered, adjudged and decreed that the Defendant shall pay the sum of $161,-185.91, representing (a) disgorgement of the Defendant's profits in trading Shearson and BankAmerica; (b) disgorgement of the Defendant's commissions derived from soliciting purchases of Shearson and BankAmerica to his customers; (c) disgorgement of the profits earned by customers of the Defendant in the transactions set forth in ¶ 32 *supra*; (d) a penalty equal to the Defendant's profits on his BankAmerica trading; (e) a penalty equal to the profits earned by customers of the

Defendant in the transactions set forth in ¶ 32 *supra;* and (f) pre-judgment interest on the Defendant's profits and commissions.

42. The portion of the monies to be paid representing disgorgement and pre-judgment interest, namely $100,385.91, shall be paid into the registry of this Court, within 10 business days of receipt by Defendant's attorney of written notice of entry of this decision and final judgment, by certified check, bank cashier's check or money order drawn to the order of "Clerk, United States District Court, S.D.N.Y.," whereupon the Clerk of the Court, or the Financial Deputy Clerk, is hereby directed to deposit said check or money order into an account for this case with the Court Registry Investment System (the "C.R.I.S.") administered through the United States District Court for the Southern District of Texas (the "C.R.I.S. Account") Funds in the C.R.I.S. Account shall be held by the C.R.I.S. until further order of the Court, and shall be disbursed in accordance with a plan of distribution to be submitted by the Commission and approved by the Court. In no event shall any portion of the C.R.I.S. Account be returned to the Defendant, his successors, or assigns. Interest earned on the funds in the C.R.I.S. Account shall be credited to the Account and shall thereafter be treated in the same manner as principal.

43. Prior to making any disbursements from the C.R.I.S. account, the custodian of the C.R.I.S. Account is directed to deduct from the income earned on the investment a fee, not exceeding that authorized by the Judicial Conference of the United States and set by the Director of the Administrative Office at equal to ten percent (10%) of the income earned, and without further order of this Court.

44. The portion of the monies to be paid representing a penalty under the Insider Trading Sanctions Act of 1984 [15 U.S.C. § 78u(d)(2)(A)], namely $60,800, shall be paid within 10 business days of receipt by Defendant's attorney of written notice of entry of this decision and final judgment, by certified check or money order to the United States Treasury, payable to the order of the Securities and Exchange Commission. The payment shall be transmitted by registered mail to the Comptroller, Securities and Exchange Commission, 450 Fifth Street, N.W., Washington D.C. 20549, under a cover letter identifying the action and the Defendant. A copy of the cover letter and payment shall be transmitted to counsel of record for the Commission.